UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDREW H.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 1:18-cv-01318-SEB-DLP |
| | ) |
| ANDREW M. SAUL, Commissioner of the Social Security Administration, | ) ) ) |
| | ) |
| Defendant. | ) |

# ORDER

Plaintiff Andrew H. ("Andrew") has appealed the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his September 29, 2014, application for disability insurance benefits ("DIB"). R. (Dkt. 5) at 16. The application was initially denied on December 3, 2014, R. at 128, and upon reconsideration on February 23, 2015. R. at 133. The administrative law judge ("ALJ") conducted a hearing on December 8, 2016, R. at 66, and a supplemental hearing on February 7, 2017, R. at 37, resulting in a decision on April 12, 2017, that Andrew was not disabled and thus not entitled to receive DIB. R. at 13. The Appeals Council denied review on March 5, 2018, and the Commissioner's decision became final. R. at 1. On

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

May 1, 2018, Andrew timely filed this civil action seeking judicial review of the decision pursuant to 42 U.S.C. § 405(g). Dkt. 1.

For the reasons below, the decision is reversed and the case remanded for action consistent with this order.

**Background[2]**

The ALJ followed the five-step sequential evaluation set forth by the SSA, *see* 20 C.F.R. § 404.1520(a)(4)(i) to (v), in concluding that Andrew was not disabled. Specifically, the ALJ found as follows:

- Andrew last met the insured status requirements for DIB on December 31, 2015 (the date last insured or "DLI").[3] R. at 18.

- At Step One, Andrew had not engaged in substantial gainful activity[4] since the alleged onset date of disability. *Id*.

- At Step Two, he had the following severe impairments: "status post cervical spinal cord injury with associated neuropathy of the upper extremities and allodynia of T11 dermatome." *Id*. (citation omitted).

- At Step Three, he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. R. at 20.

---

[2] The discussion of Andrew's medical history and treatment includes sensitive and otherwise confidential medical information that has been thoroughly detailed in the ALJ's decision and the parties' respective briefs. To the extent possible, we detail here specific facts only as necessary to address the parties' arguments.

[3] Andrew must prove the onset of disability on or before his DLI to be eligible for benefits. *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012); *see also* 20 C.F.R. § 404.131. The ALJ's subsequent findings were properly limited to the relevant period at issue beginning with the alleged disability onset date, September 17, 2014, through the DLI. *See, e.g.,* R. at 18.

[4] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

- After Step Three but before Step Four, Andrew had the residual functional capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(b) except he can lift and carry twenty pounds occasionally and ten pounds frequently. He can stand and/or walk six of eight hours and sit six of eight hours with normal breaks. He can never climb ropes, ladders, or scaffolds. He can occasionally climb ramps and stairs. He can perform all other postural activities frequently. He must avoid all use of dangerous moving machinery and exposure to unprotected heights. He must avoid constant exposure to excessive vibration. He can tolerate a noise level of 3. He must be allowed to be off task not to exceed 10% of the workday and absent one day per month." R. at 21.

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Andrew's RFC, he was capable of performing his past relevant work as a production manager and purchasing agent. R. at 26.

- In the alternative, at Step Five, relying on the testimony of the VE and in light of Andrew's age (54 years of age on the DLI), education (at least a high school graduate), and RFC, there were jobs that existed in significant numbers in the national economy that he could have performed using transferrable skills acquired through his past work, including office record keeping skills, supervising, hiring, firing, and scheduling. R. at 27-28. Additionally, considering those same factors, there were unskilled jobs at the light exertional level that he could have performed, including as a cashier, sales attendant, and collator operator. R. at 28.

## **Standard of Review**

Upon review of the Commissioner's decision,

> [w]e will uphold [it] if it applies the correct legal standard and is supported by substantial evidence. *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). Our review is limited to the reasons articulated by the ALJ in her decision. *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010).

*Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). In determining whether the decision was properly supported, we neither reweigh the evidence nor assess the

credibility of witness, nor substitute our judgment for the Commissioner's. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## Analysis

Andrew presents four issues for our review: whether the ALJ erred in (1) addressing his fatigue, (2) not including manipulative limitations in the RFC, (3) evaluating the various treating source opinions, and (4) not considering his work history in support of his credibility. We address these issues in turn below:

### Fatigue

The ALJ explained that Andrew "testified to fatigue, though it is rarely mentioned in his treatment notes." R. at 24. Andrew asserts that "is untrue, and [he] regularly reported his problems with fatigue." Dkt. 9 at 19. In assessing the veracity of alleged symptoms, an ALJ is required to "build an accurate and logical bridge from the evidence to [the] conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). We agree that the ALJ's finding on this point fell short. Beyond the conclusion cited above, which lacks substantial evidentiary support, she provided no support or elaboration.

The ALJ's own summary of the medical evidence included several references to Andrew's fatigue, including that Andrew "noted feeling sluggish and worn out at times," in January 2015, while being treated by a physical medicine and rehab physician, Katherine Stenson, M.D. R. at 22 (citing R. at 672). The ALJ also noted that in a follow up visit with another physical medicine and rehab physician, Sherly Katta-Charles, M.D., in October 2015, Andrew "complained of daytime fatigue, and Dr. Katta-Charles recommended a sleep study." R. at 23 (citing R. at 717). The ALJ recounted that the

4

sleep study was normal, but, in a follow-up visit in January 2016, "Dr. Katta-Charles prescribed Ritalin in addition to [A]mantadine for cognitive fatigue . . . ." R. at 24 (citing R. at 716).

Andrew cites other allegations of fatigue contained in the record. Dkt. 9 at 19 (citing R. at 256 (On January 15, 2015, Andrew provided a functional report to the SSA, which described, "Most days by afternoon, I am extremely mentally and physically fatigued and I function slower as the day continues through the day/evening."); R. at 667 (On November 5, 2014, Dr. Stenson included "fatigue" as an alleged "constitutional" symptom in a "review of systems" report.); R. at 711 (On July 22, 2015, another treating provider, Robert J. Alonso, M.D., recorded that "[a]dditional complaints include those of intermittent confusion, disorientation, generalized weakness, fatigue, and difficulty with higher executive functioning.")). Andrew consistently reported fatigue to his multiple treating providers over a considerable period of time. The ALJ's decision cannot be upheld based on her isolated explanation which is contrary to the evidence, evidence that she herself, in part, detailed; there simply is no logical bridge from that evidence to her conclusion.

Andrew also asserts that the ALJ erred by not including any relevant functional limitations in her RFC finding (or at least not explaining why such limitations were dismissed). Dkt. 9 at 19.

The Commissioner rejoins that it was Andrew's burden to submit medical evidence establishing the severity of his impairments. Dkt. 13 at 11. Specifically, the

Commissioner contends that "[n]o doctor has opined that Plaintiff's fatigue would diminish his ability to perform work." *Id*. at 13. We do not agree with that finding.

In response to Andrew's later argument concerning the opinion evidence, the Commissioner observed that "Dr. Katta-Charles opined that Plaintiff's limitations included situations with limited stress and interpersonal relations that he was 100 percent *psychologically* disabled." Dkt. 13 at 16 (emphasis in brief) (citing R. at 681). Despite the Commissioner's view that Dr. Katta-Charles's opinion "offered no insight into Plaintiff's fatigue," Dkt. 13 at 16, we are not persuaded that the described limitations have no connection to Andrew's alleged fatigue. Dr. Katta-Charles specifically opined that treatment would not substantially improve "function and employability," explaining that her opinion was based on "chronic pain due to spinal cord injury and resultant fatigue." R. at 680. As noted above, Dr. Katta-Charles prescribed medications to treat Andrew's complaints of fatigue and was familiar with his allegations. She also commented that her opinion was supported by the objective findings based on the then-pending neuropsychological testing. *Id*.

The results of the neuropsychological testing provided further support for possible limitations related to Andrew's alleged fatigue. On September 23, 2015, Bradley Hufford, Ph.D., completed the neuropsychological examination at the request of Dr. Katta-Charles, which included more than six hours of testing. R. at 691. Dr. Hufford's conclusions included the following:

> The patient reports a considerable degree of variability in his cognitive functioning. I strongly suspect that this variability is highly related to pain, fatigue, and mood factors predominantly. It is likely that under conditions

6

> of greater pain, the fatigue or affective distress, the patient experiences a greater difficulty with attention functions and processing speed in particular and if this has deleterious effect on his perception of his cognition as a whole [sic]. In addition, it is highly likely that his diminished attentional resources predispose him to have a lower frustration tolerance and to become irritated more easily.

R. at 696. Dr. Hufford "strongly recommended" compensatory behavioral strategies for attention that included eliminating distractions with a quiet work environment, no mulit-tasking, and taking short breaks between tasks. R. at 698. Secondary to the irritation concerns, Dr. Hufford also recommended that Andrew be permitted to "excuse himself to a quieter area" and avoid "conversation or interaction until he feels more relaxed." *Id*. Dr. Hufford's conclusions describe similar limitations to those proffered by Dr. Katta-Charles and attributes those limitations, at least in part, to the effects of fatigue.

Thus, remand is necessary to give full consideration to Andrew's allegations of cognitive fatigue. On remand, the ALJ should consider the relevant evidence, including the opinion of Dr. Katta-Charles and the assessment of Dr. Hufford, to assess appropriate limitations consistent with the evidence, and provide a sufficient explanation to allow meaningful review of the ways and extent to which the ALJ's conclusions are supported by relevant evidence.

### **Manipulative Limitations**

Andrew next contends that despite the ALJ finding that he has the severe impairment of neuropathy of the upper extremities, the ALJ did not include limitations in his RFC reflecting his bilateral hand impairments, except that he should avoid constant exposure to excessive vibration. Dkt. 9 at 22. The ALJ cited evidence that Andrew had

reduced strength in the upper extremities. *Id*. (citing R. at 22-23). However, Andrew contends that the ALJ did not explain why, in his view, these findings did not support any limitations as to his ability to use his hands for fingering and handling, other than her observation that he clearly engages in fingering while managing his business and doing paperwork. Dkt. 9 at 22. Andrew argues that the ALJ neglected "to acknowledge that [he] testified he only engages in this activity one time a month for thirty to ninety minutes." *Id*. (citing R. at 81-82).

The Commissioner asserts that the ALJ reasonably assessed Andrew's hand limitations and that her conclusions were supported by evidence that demonstrated he had normal fine fingering at a November 2014 consultation examination as well as full strength in his hands and very well controlled neuropathic pain in a treatment visit with Dr. Katta-Charles in January 2016. Dkt. 13 at 13-14. The Commissioner notes that the ALJ properly mentioned Andrew's continued involvement in his lawn care business in the context of Dr. Eric Horn's opinion that Andrew could use his hands for handling and fine finger manipulation zero percent of an eight-hour workday. *Id*. at 15 (citing R. at 689 (Dr. Horn's opinion dated September 15, 2015)).

We agree that the ALJ has failed to adequately explain why Andrew's manipulative limitations, including gross manipulation (or handling) and fine manipulation (or fingering), were completely discredited.

On the one hand, there is significant evidence supporting manipulative limitations. On November 29, 2014, "[g]rip strength [was] subjectively assessed as normal at 3.5/5 bilaterally." R. at 360. On September 15, 2015, Eric M. Horn, M.D., Ph.D., director of

8

spinal neurosurgery at Indiana University, examined Andrew and indicated the "[h]e has full strength in his upper and lower extremities with the exception of 4/5 strength in his hand intrinsics . . . ." R. at 749. On September 23, 2015, the neuropsychological testing "demonstrated moderate to severe impairments bilaterally on a test of manual motor strength, with the left side slightly weaker than would be expected compared to the right (dominant) side." R. at 695.[5] Furthermore, there are multiple medical source statements opining limitations with handling and fingering, including most notably the treating specialist opinion of Dr. Horn. R. at 689; 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

On the other hand, there is also evidence of Andrew's normal hand and finger functioning. The November 2014 consultative examination revealed that Andrew was "able to fully close all fingers into a first, and button clothing utilizing both hands," had full finger abduction, was able to write with his dominant right hand, and had no visible signs of dysfunction in his hand. R. at 360. The most recent record evidence, from a January 28, 2016 treatment visit with Dr. Katta-Charles, indicated that neuropathic pain

---

[5] Both the ALJ and the Commissioner address this evidence but point out that the Dr. Hufford did not mention Andrew's problems with motor strength in the summary, conclusions, and recommendations sections of his report. R. at 23; Dkt. 13 at 6. We are not sure what this distinction is intended to signify, particularly given that the testing included an assessment that effort was normal. R. at 694. More to the point, the distinction is not accurate. The summary included a discussion that "because of the motor limitations, the patient's performances on processing speed tasks, which involve a high degree of motor responding, may have been negatively influenced by these motor factors as well." R. at 696. Dr. Hufford's conclusions included that Andrew's "difficulties in performances are undoubtedly negatively influenced at least a little bit by his motor impairments. However, I suspect that there is a diminished attention and processing speed in the absence of motor difficulties as well." *Id*.

was "very well controlled" and suggested that motor strength was normal in the upper extremities. R. at 715 ("Strength is 5/5 except 4/5 in the right knee flexion and ankle dorsiflexion and plantar flexion." However, the examination does not specify whether grip strength was evaluated).

The ALJ cites the fact of normal fingering as demonstrated during the November 2014 consultative examination. R. at 24. However, more specialized testing in September 2015 both with Dr. Horn and during the neurocognitive evaluation showed decreased motor strength and speed in the hands. The consultative examination also showed decreased grip strength, which Andrew subjectively assessed to be normal for him.

The Commissioner's brief strongly suggests that the evidence of limitations was significantly undermined by evidence that Andrew's hand functioning improved over time. Most notably, the Commissioner cites the most recent examination with Dr. Katta-Charles which is suggestive of full strength in the upper extremities (presuming that they were tested) and includes reports that Andrew's neuropathic pain was controlled. The ALJ also cited evidence of the pain being controlled. *Id*. However, the ALJ herself has not explicitly shown how the evidence supports the finding of a total recovery to a point where there are no limitations. "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88 (1943); *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir.2010)).

We cannot presume that the ALJ meant to suggest that the condition had completely recovered to a point of normal functioning. For one thing, use of a single examination or report of controlled pain is problematic because symptoms may wax and wane. *See Groskreutz v. Barnhart*, 108 F. App'x 412, 414 (7th Cir. 2004). Also, even in the absence of pain, permanent neurological impairments may still limit functioning. *See* R. at 96 (Andrew testified that decreased sensation in his fingers and hands contributed to him dropping things.). The neurocognitive assessment alluded to limitations with the speed at which Andrew could respond to testing items because of his motor impairment. Dr. Horn attributed limitations with the use of Andrew's upper extremities to symptoms in addition to pain that included sensory loss/numbness, spasticity, and incoordination. R. at 688.

The ALJ's use of Andrew's work activity after the alleged disability onset date is particularly problematic. The Seventh Circuit has repeatedly cautioned against reliance on activities of daily living without recognizing important qualifications placed on those activities or without acknowledging the differences between the performance of limited activities and meeting the demands of full-time work. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). The Seventh Circuit has also "cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment." *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017).

The ALJ explained that in Andrew's case testimony describing "significant difficulty using his hands" was undermined, in part, because "he clearly engages in fine and gross hand movements while managing his business and doing paperwork." R. at 24. However, the ALJ failed to consider the entirety of Andrew's testimony, which is consistent with his interview during the neurocognitive evaluation, to the effect that his daughter-in-law manages the day-to-day operations of his lawn care business, while he manages the financial aspects. R. at 693. Andrew testified that he prepares invoices for a single customer with four properties serviced by the lawn care business and that he writes checks for the limited expenses, mainly gasoline, paid all to one credit card account. R. at 77-81. Andrew further testified that he performs this work once a month and sometimes can get it done in a half-hour, unless he has difficulty concentrating; it takes him an hour and a half at most. R. at 81-82. Andrew's work activity, properly considered but entirely ignored by the ALJ in the written decision, significantly erodes the contrary finding that Andrew suffers from no disability regarding his hands in terms of handling and fingering on a regular and continuing basis in fulfilling the demands of full-time work.

The Commissioner's argument that the evidence was offered only in the context of evaluating Dr. Horn's opinion is not completely accurate. The evidence was also proffered to refute Andrew's testimony. Further, it is not completely apparent that the ability to do such fingering as Andrew performed once a month for thirty to ninety minutes is necessarily inconsistent with a finding that Andrew was unable to use his hands for handling or fingering throughout an eight-hour day, because that assessment is

12

in the context of what can be done on a regular and continuous basis five days a week. Even if we were persuaded that Dr. Horn's limitation is not supported by the evidence of record, including Andrew's daily activities, it does not necessarily follow that Andrew experiences no limitations at all with his handling and fingering. Accordingly, remand is necessary to allow the ALJ to consider the nature and extent of Andrew's limitations with handling and fingering and to clearly explicate those findings and conclusions.

Mindful as we are of the standard of review that precludes the court from reweighing conflicting evidence, we find nonetheless that a remand is necessary to permit further consideration and a more fully articulated explanation by the ALJ of the way the evidence supports her conclusions. Here, the written decision fails to provide a logical bridge from the evidence to the conclusions, particularly the finding that no impairment in handling and fingering existed at all.

### **Other Arguments**

We decline to address any further arguments, having found remand necessary on the above issues.

### **Conclusion and Order**

For the reasons explained above:

The ALJ's decision is REVERSED and the case is REMANDED for proceedings

consistent with this order under sentence four of 42 U.S.C. § 405(g). Final judgment shall issue in a separate order. Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.

Date: 8/21/2019

*SARAH EVANS BARKER, JUDGE*
United States District Court
Southern District of Indiana

Distribution:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov

Catherine Seagle
SOCIAL SECURITY ADMINISTRATION
catherine.seagle@ssa.gov

Christie O'Brien Tate
SOCIAL SECURITY ADMINISTRATION
christie.tate@ssa.gov